UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
MARIE CASALINO,                 :        09 Civ. 2583 (LAP)
                                :
              Plaintiff,        :        Opinion & Order
                                :
       v.                       :
                                :
NEW YORK STATE CATHOLIC         :    ┌─────────────────────────┐
HEALTH PLAN, INC., d/b/a        :    │ **USDC SDNY**           │
FIDELIS CARE NEW YORK,          :    │ **DOCUMENT**            │
                                :    │ **ELECTRONICALLY FILED**│
              Defendant.        :    │ DOC #: _____ │
------------------------------x      │ DATE FILED: 3/30/12     │
                                     └─────────────────────────┘

LORETTA A. PRESKA, Chief United States District Judge:

    Plaintiff Marie Casalino ("Casalino" or "Plaintiff") brings
this action against her former employer New York State Catholic
Health Plan, Inc. ("Fidelis" or "Defendant") alleging unlawful
gender discrimination in the forms of hostile work environment
harassment, retaliation, and disparate treatment in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)
et seq. ("Title VII") and the New York City Human Rights Law,
N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL" or "HRL").  Fidelis
moves for summary judgment and dismissal of these claims under
Federal Rule of Civil Procedure 56.  For the reasons below,
Defendant's motion is GRANTED in part with prejudice and DENIED
in part.

I.   BACKGROUND

    The Court presumes the parties' familiarity with the facts
of this case, which are quite lengthy and have been set out in

1

detail in the parties' 56.1 Statements and Counter-Statements [dkt. nos. 40-42, 48.]  Nevertheless, the Court undertakes to include a brief summary of the facts for the purposes of this opinion, citing variously to Defendant's Rule 56.1 Statement ("D. 56.1"), Plaintiff's Rule 56.1 Statement ("P. 56.1"), and Defendant's Response to Plaintiff's Statement of Facts ("Def. Reply 56.1").  To the extent there appears to be a material dispute as to any fact referenced in this fact summary or opinion based on admissible evidence, the Court has endeavored to so indicate.

Casalino is a board-certified pediatrician with a subspecialty in Neonatal-Perinatal medicine.  She holds a Master's Degree in public health.  In 1998 Plaintiff moved from clinical and academic medicine into public health administration.  In 2003 she entered the field of managed health care.  In February 2005 she was hired by Mark Lane ("Lane"), Chief Executive Officer of Fidelis, as a medical director. Plaintiff reported directly to Dr. Marco Michelson ("Michelson"), Fidelis' Chief Medical Officer, and she worked out of Fidelis' headquarters in Rego Park, Queens.  In autumn 2005 a second medical director, Dr. Nancy Klotz ("Klotz"), joined Fidelis and also began reporting to Michelson.  (P. 56.1 ¶¶ 312-15, 324.)

In October 2005 Fidelis acquired Center Care, another health plan located in Manhattan.  After having received a generally positive 90-day written performance evaluation in June 2005, Fidelis appointed Plaintiff medical director of its new Center Care branch in addition to her other duties.  She maintained offices at Center Care and at Fidelis.  In March 2006, Michelson gave her a written performance evaluation with an overall score of "successful" which resulted in a raise.  (P. 56.1 ¶¶ 322-23.)  At all times, Fidelis had a Code of Conduct and an Employee Handbook, both of which prohibited employee discrimination and harassment.  The Handbook states that any allegations of harassment or discrimination will be "promptly and thoroughly investigated."  It states that harassment can occur "over email, phone mail or other electronic media."  The Handbook also sets forth a formal corrective action procedure, under which employees with performance problems are to be given two written warnings on a specific "corrective action form." (P. 56.1 ¶¶ 331-41.)

In March 2006, Susan Davis ("Davis"), a supervisor for clinical services who worked in the Buffalo office, asked to speak with Diane Tucker ("Tucker"), Fidelis' Vice President of Human Resources, about what she called a "sensitive issue." Davis told Tucker that Michelson had been "loud," "unreasonable," and "unprofessional" in a telephone call with

her.  Davis also told Tucker that Liya Davidov ("Davidov"), in
Fidelis' pharmacy department, had also had a similar interaction
with Michelson.  Davis had complained to Tucker in Human
Resources about Michelson, and Tucker had told her that she
would look into the matter and get back to her.  According to
Davis, Tucker never did so.  (P. 56.1 ¶¶ 348-60.)

On May 15, 2006, Vicki Landes ("Landes"), Director of
Clinical Services and Davis's immediate supervisor, received a
phone call from Michelson in which he became very angry and
vocal, accusing her of not doing job and then slamming his phone
down.  Landes became very upset at the interaction and spent 10-
15 minutes in a co-worker's office trying to compose herself.
Landes then called Robert Fazzolari ("Fazzolari"), Assistant
Vice President for Corporate Compliance.  Fazzolari called her
back with Regina Trainor ("Trainor"), Chief Legal Officer and
Head of Compliance at Fidelis.  Landes explained the incident to
them, and they informed her that Tucker would be following up
with her.  (P. 56.1 ¶¶ 361-75.)  Landes also called Plaintiff,
who was her direct supervisor, who was at home on medical leave
at the time.  Landes was very upset, and Plaintiff tried to help
her regain her composure.  Plaintiff told Landes that she was
going to come back to work and help her with this incident.  In
the meantime, Plaintiff and Landes agreed that Landes should
stay clear of Michelson.  (P. 56.1 ¶¶ 376-80.)

4

Human Resources did not contact Landes.  On May 17 and 19, 2006, Landes e-mailed Tucker and Fazzolari requesting a follow-up on the Michelson situation.  Tucker did not reply to either e-mail.  (P. 56.1 ¶¶ 382-85.)  On May 17, 2006, Plaintiff returned to work, and Tucker came to visit her about the Landes-Michelson incident.  Plaintiff reported to Tucker that she found it upsetting that Landes had been so frightened by the call and said she would do whatever she could to help smooth things over. (P. 56.1 ¶¶ 386-89.)  Tucker then spoke to Michelson and requested that he reprimand individuals, if at all, one-on-one and not with others around.  (P. 56.1 ¶ 391.)

Thereafter, Landes attempted to stay clear of Michelson, but Plaintiff shortly found herself mediating an additional dispute between them.  Michelson had sent Landes an e-mail accusing her of not doing certain work on Fidelis' website. Landes explained to Plaintiff that she had never been assigned the work.  When Plaintiff attempted to explain this to Michelson, he reacted sharply, harshly criticizing Landes. Plaintiff told Landes they would try and address the website issue together and Landes could go through Plaintiff in her dealings with Michelson.  (P. 56.1 ¶¶ 393-400, 403-05.) Following this mediation, however, Plaintiff noticed that Michelson became more difficult for her to deal with.  He attempted to marginalize Plaintiff in her meetings with Lane and

Fidelis Chief Operating Officer Father Patrick Frawley ("Frawley"). He prevented Plaintiff from including her matters on the meeting agendas, interrupted her when she attempted to speak, and criticized her comments after she had spoken. Plaintiff eventually began taking notes and making comments in private conversations with participants after meetings ended. She told Michelson that she was being quiet due to his interruptions and criticisms whenever she spoke. Michelson then began criticizing Plaintiff's written submissions. He eventually became difficult to deal with on administrative matters like approvals for days off or time for medical appointments. (P. 56.1 ¶¶ 417-24.)

In the autumn of 2006, Plaintiff was responsible for completing a project entitled Best Clinical Administrative Practices ("BCAP"), which required the completion and submission of a report and presentation to New York State in order to meet certain regulatory requirements for both Fidelis and Center Care. Michelson had assigned Plaintiff the task when she became Medical Director for Center Care in September 2005. Plaintiff and Michelson had difficulty coordinating his edits to the presentation leading up to its due date on September 8, 2006, particularly in light of Lane and Frawley's significant issues with an earlier draft that Plaintiff had submitted. On September 7, 2006, the night before the project was due and

6

Plaintiff and Michelson were to present it once again to Lane and Frawley, having not received Michelson's edits by 5 p.m., Plaintiff left for the day.  She assigned an administrative assistant the task of waiting for and then making any final changes Michelson might have.  (See Def. 56.1 ¶¶ 139-52; P. 56.1 139-52.)

On September 8, 2006, while waiting to make the final presentation to Lane and Frawley, Michelson began berating Plaintiff in the anteroom outside Fidelis' executive office. Specifically, Michelson said he was frustrated that Plaintiff had not taken ownership for her projects and assignments, had not gotten her work done, and had left assignments for others. Klotz and two additional staff were present in the room during this interaction.  After Plaintiff gathered herself, the meeting on the submission to the New York State Department of Health took place.  After the meeting, Michelson called Plaintiff to his office and started yelling and waiving his hands.  Plaintiff asked Michelson not to speak to her that way but "he just kept screaming and screaming."  Plaintiff left Michelson's office, returned to her own, and broke down.  She called Tucker who came to Plaintiff's office.  Plaintiff informed Tucker that Michelson had treated her the way she had heard that he treated other women.  Plaintiff remained in her office with the door closed

for the rest of the day.  (P. 56.1 ¶¶ 454-58; Def. 56.1 ¶¶ 154-58.)

On September 13, 2006, Plaintiff met with Trainor and Fazzolari regarding the incident.  She told them she had been frightened and reduced to tears and sobbing and that there were women who were afraid to be in an office with Michelson. Plaintiff told Trainor, "you have a problem employee who behaves inappropriately towards women and you are now on notice from me that you have to do something about him."  Plaintiff felt that Trainor was unsympathetic.  Trainor told Plaintiff that she felt this was an issue with Michelson's management style and that Michelson was trying to manage her.  (P. 56.1 ¶¶ 464-67.) Tucker did not conduct any further investigation into Plaintiff's complaint.  Tucker did speak with Michelson, advising him to "adjust how he was interacting and figure out a way to work with Marie."  (P. 56.1 ¶¶ 478-81.)

In October, Fidelis announced that Michelson was taking a leave of absence from the company effective November 1, 2006, and that Klotz would take over as acting Chief Medical Officer. (Pl. 56.1 ¶ 488.)  At her prior performance evaluation in March 2006, Plaintiff had requested that Michelson provide her with an interim performance evaluation in six months time.  That review took place just before he left, on or about October 31, 2006. (Def. 56.1 ¶ 184.)  In this review, Plaintiff received six

"needs improvement" scores in various areas, and Michelson reported that Plaintiff needed to improve her level of ownership over projects, be more willing to discuss her own shortcomings, be more involved in the clinical service departments, and better improve the credentialing process over which she was in charge. The overall score for the review was "Needs Improvement," which was the second lowest score possible to achieve. (Def. 56.1 ¶¶ 187-91.) On or about December 15, 2006, Plaintiff filed an extensive written response to this review with Fidelis in which she defended herself on substance and made no mention of retaliation or discrimination. She claimed that the review was unfair and that Fidelis' fiscal challenges may have compromised her performance. (Def. 56.1 ¶¶ 199-201.)

While working under Klotz during Michelson's leave of absence, Klotz informed Plaintiff that Lane and Frawley had a negative opinion of her work. Plaintiff told Klotz that she felt that Michelson had made an effort to diminish her in their eyes. Plaintiff worked closely with Klotz during this period, dividing up Michelson's responsibilities, and Klotz ultimately felt that she could not have done the work of acting Chief Medical Officer without Plaintiff's help. On December 7, 2006, after a series of presentations to a committee of the Fidelis Board of Directors, Klotz told Plaintiff that she felt that "we had turned a corner" in restoring Plaintiff's credibility.

Plaintiff told Klotz she felt it was owing to Michelson's absence.  (P. 56.1 ¶¶ 493-505.)   In mid-December, word spread that Michelson would be returning in January 2007.  Plaintiff was very worried and spoke to both Klotz and Tucker about her concerns.  Both assured her that things would be better upon his return.  (P. 56.1 ¶¶ 513-36.)

Klotz left for a vacation in Israel from December 21, 2006 through January 2, 2007.  As of December 21, her October performance review notwithstanding, Plaintiff had never received a warning notice under the Fidelis corrective action policy as described in the Employee Handbook and had never been advised that she was in danger of termination.  Her feedback from Klotz had been positive.  (P. 56.1 ¶¶ 517, 600.)  Beginning December 22, 2006, however, four incidents came to a head almost simultaneously which, according to Fidelis, were "significant performance deficienc[ies]" and largely formed the basis for Plaintiff's ultimate termination.  (See, e.g., Def. 56.1 ¶¶ 216, 253.)  They were:  (1) Plaintiff's failure to revoke the credentials of a Dr. Cheng as a Fidelis provider consistent with Fidelis' policy regarding medical license revocations and the like; (2) Plaintiff's failure timely to revoke the credentials of a Dr. Florio for substantially the same reasons; (3) Trainor's realization that Plaintiff had "never given or ensured that Behavioral Health staff had proper access to Fidelis

computer system when they were on-call at night and over the weekend;" and (4) the "Family K" incident in which authorization of provider services was granted without having a required negotiated rate in place for those services. Each of these incidents or issues arose on or after December 22, 2006, within a 10-day period.[1]

Exactly what happened next at Fidelis is heavily disputed by the parties, as is Michelson's role, if any, in Plaintiff's ultimate termination. Michelson returned to Fidelis on January 2, 2007. That same day, Lane sent out an e-mail welcoming Michelson back and announcing that Klotz would be taking over the role of head of Center Care, which had been Plaintiff's position until that day. Plaintiff was not advised of this decision until the e-mail was sent out. (Def. 56.1 ¶¶ 274-75.) Fidelis states that this decision was made prior to Klotz's return to the office on January 3, 2007, and that "it did not mean that Plaintiff could not continue her employment at Fidelis." (Def. 56.1 ¶ 277.) Earlier that same day, however, with Michelson now back in the office, Lane had sent Michelson a draft of the same e-mail for his review and comment. Michelson

---

[1] The facts surrounding these incidents are subject to substantial dispute between the parties and go to the heart of Fidelis' proffered reasons for Plaintiff's termination, as well as Plaintiff's claim of pretext in this suit. These disputed facts are laid out at length in the parties' 56.1 Statements. (See Def. 56.1 ¶¶ 216-73, 279-89; P. 56.1 ¶¶ 216-73, 279-89; 518-81; Def. Reply 56.1 ¶¶ 518-81.)

replied, "Looks good.  Is the unspoken message too obvious?"
(P. 56.1 ¶¶ 583-89.)

Simultaneously, and as a result of the incidents in late
December 2006, Frawley had prepared a memo to Klotz for her
review upon her return and copied it to Trainor, Lane, and
Plaintiff on the morning of January 3, 2007 when Klotz returned.
The memo describes what Frawley felt were Plaintiff's "numerous
performance deficiencies" and "serious concerns" about
Plaintiff's work.  Frawley describes "grave concerns relative to
Dr. Casalino's judgment, ownership, and overall ability to
perform appropriate oversight of a critical process that has
significant regulatory and quality implications for the Plan and
its members."  Trainor responded to the memo via e-mail, largely
concurring in his judgment.  Though Klotz testified that she
began the day with no intention of terminating Plaintiff, (P.
56.1 ¶ 591), after reviewing Frawley's memo, Trainor's e-mail,
and additional materials on Plaintiff's performance, she
resolved to terminate her.  (Def. 56.1 ¶¶ 290.)  Though
Michelson had returned to Fidelis as Chief Medical Officer the
day before, Fidelis represents that "Dr. Klotz had the authority
to do so . . . because she was Plaintiff's supervisor during the
December mishaps and Dr. Michelson was not yet fully integrated
back into his role."  (Def. 56.1 ¶ 290.)

Fidelis notes that Klotz was the sole decision maker in Plaintiff's termination and had no knowledge of Plaintiff's prior complaints about Michelson.  (Def. 56.1 ¶ 215.) Similarly, Fidelis states that Michelson played no role in the decision.  (Def. 56.1 ¶¶ 293-94.)  Plaintiff, however, points to testimony from Trainor that a January 3, 2007 meeting was called in which Trainor, Lane, Frawley, Klotz, and possibly even Michelson attended and "a conclusion was reached at the meeting to terminate Casalino.  It was discussed who would terminate her, and it was decided that Klotz would." (See P. 56.1 ¶¶ 290, 596-98.)  Moreover, Klotz spoke with Michelson on January 3, 2007, prior to making her decision to terminate Plaintiff.  (Pl. 56.1 ¶ 290.)  Later that day, Plaintiff was called into a meeting with Klotz and Tucker and was informed she was terminated.  (Def. 56.1 ¶ 299; P. 56.1 ¶ 602.)  Klotz later composed a memorandum laying out the performance failures resulting in Plaintiff's termination.  (Def. 56.1 ¶¶ 300-02.)

II. DISCUSSION

A.   Summary Judgment Standard of Review

The standard for summary judgment is uncontroversial.  In considering a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the moving party.  Lindsay v. Ass'n of Prof'l Flight Attendants, 581 F.3d 47, 50 (2d Cir. 2009).  "Summary judgment is appropriate

only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Kwan v. Schlein</u>, 634 F.3d 224, 228 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." <u>Lindsay</u>, 581 F.3d at 50. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250.

Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." <u>Liberty Lobby</u>, 477 U.S. at 249-50 (internal

14

citations omitted).  In the face of insufficient evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23.

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001), cert. denied, 534 U.S. 993 (2001); see also Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000) (instructing that "trial courts should not 'treat discrimination differently from other ultimate questions of fact'") (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)).  Accordingly, a plaintiff alleging Title VII discrimination claims "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation or conjecture."  Jones v. Hirschfeld, 348 F. Supp. 2d 50, 59 (S.D.N.Y. 2004).

    B.  Analysis

Plaintiff alleges unlawful gender discrimination in the forms of hostile work environment harassment, retaliation, and disparate treatment in violation of Title VII and NYCHRL.  The Court addresses each claim in turn.  Separate analysis of the

Title VII and NYCHRL claims are provided where necessary but are
otherwise discussed together.

### 1.   Gender-Based Harassment:  Hostile Work Environment

To prevail on her claim that she experienced gender-based
harassment under Title VII, Plaintiff must show that:  (1) she
is a member of a protected class; (2) she suffered unwelcome
harassment; (3) she was harassed because of her membership in a
protected class; and (4) the harassment was sufficiently severe
or pervasive to alter the conditions of employment and create an
abusive work environment.  See Gregory v. Daly, 243 F.3d 687,
691-92 (2d Cir. 2001); Monterroso v. Sullivan & Cromwell, LLP,
591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).  For the purposes of
this motion, the Court focuses on elements three and four above.
It is axiomatic that a successful allegation of harassment must
demonstrate that the conduct of which Plaintiff complains
occurred because of her gender.  See Brennan v. Metropolitan
Opera Assoc., Inc., 192 F.3d 310, 318 (2d Cir. 1999).  Moreover,
"incidents must be more than episodic; they must be sufficiently
continuous and concerted in order to be deemed pervasive."
Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).  Plaintiff
must show that "the workplace is permeated with 'discriminatory
intimidation, ridicule, and insult . . . that is sufficiently
severe or pervasive to alter the conditions of the victim's

16

employment and create an abusive working environment.'"  Howley
v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (quoting
Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993)); see also
Brennan, 192 F.3d at 318 ("Isolated, minor acts or occasional
episodes do not warrant relief.").

　　　Here, Plaintiff has simply failed to adduce sufficient
evidence to support even a prima facie claim of gender-based
workplace harassment.  For the reasons below, Plaintiff cannot
point to facts sufficient for a reasonable jury to find that (a)
the conduct she experienced was based upon her gender, or (b)
rose to a level that was sufficiently severe or pervasive.  For
these reasons, Defendant's motion for summary judgment as to the
hostile work environment claim must be granted, whether
categorized as a Title VII or NYCHRL claim.

　　　To be actionable, the conduct of which Plaintiff complains
must have occurred because of her gender.  Brennan, 192 F.3d at
318; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81
(1998).  Incidents, however abusive, that are not gender-related
are not relevant to establish a claim against Fidelis that can
survive its motion for summary judgment.  See Norris v. N.Y.C.
Hous. Auth., No. 02 Civ. 6933, 2004 WL 1087600, at *12 (S.D.N.Y.
May 14, 2004) ("[R]udeness without any evidence of
discriminatory intent does not constitute discrimination.").

Plaintiff's harassment allegations in this case reduce to essentially one verbal encounter with Michelson, which was itself in no way characterized by any gender-specific animus. (Def. R. 56.1 ¶¶ 139-143.)  Plaintiff does not allege that Michelson ever made, for example, derogatory comments about women or engaged in any sexually inappropriate behavior.  (See generally P. 56.1.)  Plaintiff's testimony in this regard does not raise even a direct inference of conduct occurring because of her gender.  In fact, Plaintiff concedes that this incident occurred after she left the "BCAP" project in the hands of an executive assistant just before its deadline.  (Def. R. 56.1 ¶¶ 151-52.)  Apart from this one central interaction, Plaintiff elsewhere suggests that she was "marginalized" and "ignored" by Michelson during meetings and the like.  (Def. R. 56.1 ¶ 307.) Plaintiff places particular emphasis on her own reactions, noting that Michelson "berated her and frightened her, reduced her to tears to the point where she could not leave her office." (See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opp.") at 21.)  Plaintiff's own reactions, however, even if credited by the jury as true, cannot themselves demonstrate Michelson's gender animus.

Nor can Plaintiff sustain a prima facie case of gender harassment here by pointing to the experiences of other women at Fidelis.  "The critical issue, Title VII's text indicates, is

18

whether members of one sex are exposed to disadvantageous terms or conditions of employment <u>to which members of the other sex are not exposed</u>."  <u>Oncale</u>, 523 U.S. at 80 (citing <u>Harris</u>, 510 U.S. at 25) (emphasis added).  While it is certainly true that hostile work environment claims turn on a totality of the circumstances which may include consideration of conduct directed at other employees, <u>see</u> <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 572 (2d Cir. 2000), Plaintiff's invocation of co-workers Landes and Davis is actually self-defeating as their own testimony supports the notion that Michelson was in fact an "equal opportunity" offender.  (<u>See</u> Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment ("Def. Reply Mem.") at 5-6.)  Nowhere does Plaintiff actually allege that Landes or Davis were yelled at <u>because</u> they were female.  Both Landes and Davis themselves testified that their encounters with Michaelson were gender-neutral and that Michelson also treated male employees harshly.  (Def. R. 56.1 ¶¶ 100, 110-12, 115.)  Landes testified that Michelson spoke harshly to male employees Boardman and Weinberg to such extent that Boardman felt the situation needed to be addressed with Human Resources.  (<u>Id.</u> ¶ 111.)  Davis herself testified that she personally observed Michelson yelling at Weinberg during a management meeting.  (<u>Id.</u> ¶ 112.)  Moreover, Plaintiff herself testified that she felt Michelson respected her, at least

through May 2006, (id. ¶ 56), and also testified that female co-workers Klotz, Trainor, and Tucker had positive interactions with Michelson and she never witnessed those individuals treated in a hostile manner. (Id. ¶ 183.)

It is not controversial that Casalino may offer "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace" as an "evidentiary route" to raising an inference of discriminatory intent. See Oncale, 523 U.S. at 80-81. Moreover, a jury is certainly permitted to find gender motivation on the basis of disparate treatment itself, derogatory verbal comments alone, or a combination of both. See Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117-19 (2d Cir. 2010). The problem in this case is that Plaintiff has offered insufficient evidence of either to permit a reasonable jury to find that Michelson's conduct occurred because of her gender.

Even if Plaintiff could establish that Michelson's conduct occurred because of her gender, Plaintiff cannot establish to the extent she must that the conduct was sufficiently "severe or pervasive" within the meaning of Title VII. Among the factors courts look to in assessing the severity of any alleged harassment are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." Harris, 510
U.S. at 23.  The Court of Appeals has said that one incident is
generally insufficient to support a harassment claim unless it
constitutes "an intolerable alteration of the plaintiff's
working conditions . . . so as to substantially interfere with
or impair his ability to do his job." Mathirampuzha v. Potter,
548 F.3d 70, 79 (2d Cir. 2008).  For the reasons described
above, Plaintiff's allegations essentially reduce to the single
September 2006 incident in which Michelson engaged in a verbal
altercation with her.  (Def. R. 56.1 ¶¶ 139-183.)  But Plaintiff
continued to work with Michelson through his leave of absence in
November 2006 and Plaintiff offers no evidence at all that any
further exchange of that sort took place between them.  (Def. R.
56.1 ¶¶ 182, 204-08.)  The Court finds that a reasonable jury
could not conclude, on the evidence Plaintiff has brought
forward on this motion, that this incident resulted in an
"intolerable alteration of the plaintiff's working conditions."
See Mathiramphuzha, 548 F.3d at 79.

    As to additional instances of harassment to which Plaintiff
refers, "the objective severity of [the] harassment should be
judged from the perspective of a reasonable person in the
plaintiff's position, considering 'all of the circumstances.'"
Oncale, 523 U.S. at 81 (citing Harris, 510 U.S. at 23).
Plaintiff alleges that Michelson "marginalized" her during

21

meetings, did not let her discuss certain meeting agenda items, and generally made her job more difficult. (Def. R. 56.1 ¶ 307.) The evidence put forward in response to this motion, however, is unspecific as to when the marginalization occurred, which agenda items were not discussed, or how exactly her job was made more difficult. (See Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Mem.") at 7-8.) While specific details as to every single incident alleged may not be necessary to find harassment severe or pervasive, see Pucino, 618 F.3d at 119-20, the evidentiary record here is broadly deficient of such details. The Court agrees with Defendant that, unlike Pucino, Plaintiff does not offer evidence of harassment which when reviewed in its totality could have affected "most of the major aspects of [Plaintiff's] employment." (See Def. Reply Mem. at 4-5 (citing Pucino, 618 F.3d at 119).)

Moreover, the Court notes that it cannot wholly divorce the question of whether harassment is severe or pervasive from the question of whether the harassment itself is based on gender. As noted above, abusive incidents that are not gender-related are irrelevant to establish a claim against Fidelis that can survive its motion for summary judgment. See Norris, 2004 WL 1087600, at *12. Such incidents are equally irrelevant in assessing the severity or pervasiveness of any harassment for

Title VII purposes.  Based on the current record, the Court concludes that no reasonable jury could find that Michelson subjected Plaintiff to gender-based harassment that was severe or pervasive.[2]

Finally, the Court's grant of summary judgment on Plaintiff's harassment claim for Title VII purposes merits a similar grant on Plaintiff's NYCHRL claim.  A NYCHRL hostile work environment claim requires that Plaintiff prove "by a preponderance of the evidence that she has been treated less well than other employees because of her gender." Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 39 (1st Dep't 2009) (emphasis added).  While it is true that the NYCHRL moves the consideration of severity and pervasiveness from the liability to the damages phase of trial, see id. at 39-40, it remains a requirement of the claim that any harassment be "because of" Plaintiff's gender.  Id. at 39.  The New York Appellate Division, First Department also recently made clear that summary judgment remains available if a plaintiff's claim of severity is not borderline.  See id. at 41 ("[W]e assure employers that summary judgment will still be available where they can prove

_____

[2] Because the Court finds that Plaintiff's prima facie case of harassment does not survive summary judgment, the Court need not address whether Michelson's behavior, had it violated Title VII, could be inputed to Fidelis under Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences."); see also Short v. Deutsche Bank, 913 N.Y.S.2d 64, 66 (1st Dep't 2010) ("The various complaints about [harasser's] conduct in the workplace were nothing more than non-actionable petty slights and minor inconveniences which in any event may be viewed by a reasonable employee as a function of [harasser's] management style, unrelated to gender discrimination," citing Williams, 872 N.Y.S.2d at 41).  Because the Court has already determined that Plaintiff cannot establish that Michelson's conduct occurred because of gender, the Court also concludes that Plaintiff fails the NYCHRL summary judgment standard on this harassment claim. Accordingly, Defendant's motion for summary judgment on the NYCHRL harassment claim is also granted.

> 2.   Retaliation Claim

Plaintiff alleges that Fidelis illegally retaliated against her following her complaint about Michelson.  Specifically, she points to her October 2006 performance review, her "marginalization" at work, and her January 3, 2007 termination. Retaliation claims are analyzed under the standard set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). In order to survive summary judgment on a Title VII retaliation

24

claim, Plaintiff must offer sufficient evidence to permit a
reasonable jury to find that (1) she engaged in a protected
activity known to Fidelis; (2) Fidelis took an adverse
employment action against her; and (3) that "a causal connection
exists between the protected activity and the adverse action,
i.e., that a retaliatory motive played a part in the adverse
employment action." Kessler v. Westchester Cnty Dep't of Soc.
Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citation omitted).
If a prima facie case is established, the burden shifts to the
employer to present a legitimate, non-discriminatory reason for
any adverse employment action. See Gallagher v. Delaney, 139
F.3d 338, 349 (2d Cir. 1998), abrogated on other grounds by
Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). Once
an employer satisfies this burden of production, all
presumptions drop out, and the plaintiff bears the burden of
persuasion in showing that the employer's proffered reason for
the adverse employment action is merely a pretext for
retaliation. Id. Plaintiff's NYCHRL claim is analyzed using a
substantially similar, though more liberalized framework. See,
e.g., DeMarco v. CooperVision, Inc., 369 Fed. Appx. 254, 255 (2d
Cir. 2010); Williams, 872 N.Y.S.2d at 33-34.

       a.   Protected Activity

    Here, Plaintiff argues that she engaged in protected
activity within the meaning of Title VII when she had a

September 13, 2006 meeting with Chief Legal Officer and
Corporate Compliance Officer Regina Trainor and Associate
Director of Corporate Compliance Robert Fazzolari in which she
reported the September 8, 2006 altercation with Michelson.  (P.
56.1 ¶ 464.)  Plaintiff alleges specifically that she informed
Trainor and Fazzolari that "there were women that were afraid to
be in the office with Michelson" and said "you have a problem
employee who behaves inappropriately towards women and you are
now on notice from me that you have to do something about him."
(Id. ¶¶ 464-67.)  Fidelis does not seriously dispute these
facts, except to clarify that Plaintiff's testimony was that she
informed Tucker in Human Resources that "there were women that
were afraid to be in the office with Michelson," rather than
Trainor or Fazzolari in the September 13 meeting.  (See Def.
Reply 56.1 ¶ 464.)  Fidelis also points out that while Trainor
later testified that she remembered Plaintiff "putting her on
notice, she understood her to mean that she was putting her on
notice that Michelson would raise his voice, not that she was
raising claims of unlawful harassment."  (Id. ¶ 466.)  Plaintiff
does separately allege that on September 8, 2006 she said to
Tucker, "he can't treat people like this, he can't treat women
like this.  This is what he did to Vicki.  I know he did this to
Sue.  He has done it to other women."  (P. 56.1 ¶ 457.)  Fidelis
does not dispute this testimony.

26

To a lesser extent, Plaintiff alleges that she engaged in protected activity when she separately discussed with Tucker the issues her colleague Vicki Landes had dealing with Michelson. Specifically, Plaintiff alleges that Tucker came to her office in May 2006 after an incident involving Landes and Michelson and said she wanted to discuss the situation.  (Pl. 56.1 ¶ 387.) Plaintiff told Tucker "she had spoken with Landes and found it upsetting that Landes was so frightened about the incident." (Id.)  Plaintiff told Tucker she would do whatever she could to help.  (Id. ¶ 388.)   Fidelis does not dispute this testimony.

In the context of a Title VII retaliation claim, "'[p]rotected activity' includes opposition to a discriminatory employment practice or participation in any investigation, proceeding, or hearing under Title VII." Hubbard v. Total Commc'ns, Inc., 347 Fed. Appx. 679, 680-81 (2d Cir. 2009).  It is clearly established that "informal complaints to supervisors constitute protected activity under Title VII." Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 427 (E.D.N.Y. 2009); see also Amin v. Akzo Nobel Chemicals, Inc., 282 Fed. Appx. 958, 961 (2d Cir. 2008); Cruz, 202 F.3d at 566; Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  Here, Plaintiff complained about what she perceived, rightly or wrongly, to be Michelson's gender animus to the head of Human Resources, the Chief Legal Officer, and the Associate Director of Corporate

27

Compliance.  (See P. 56.1 ¶¶ 387-88, 464-67.)  These complaints, even if informal, fall within the accepted definition of protected activity for Title VII purposes.

To establish that an employee engaged in protected activity sufficient to establish a retaliation claim, however, the employee must also demonstrate:

> that she had a good faith, reasonable, belief that the underlying challenged actions of the employer violated the law. . . In this regard, the reasonableness of plaintiff's belief is assessed in light of the totality of the circumstances. . . The employee's belief that [s]he was opposing an employment practice made unlawful by Title VII must also be objectively reasonable, in the sense that the asserted opposition must be grounded on sufficient evidence that the employee was the subject of discrimination and harassment at the time the protest to the offending conduct is registered.

Spadola v. N.Y.C. Transit Auth., 242 F. Supp. 2d 284, 291 (S.D.N.Y. 2003); see also Sullivan-Weaver v. N.Y. Power Auth., 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000) ("Mere subjective good faith belief is insufficient, the belief must be reasonable and characterized by objective good faith.").  Whether Plaintiff's belief was objectively reasonable for this purpose is a decision for the trier-of-fact based on the record in the case.  See Thomas v. Westchester Cnty. Health Care Corp., 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002).  Thus, although the Court has already determined, supra, that Michelson's conduct did not constitute a violation of Title VII, the question on the retaliation claim is

whether Plaintiff possessed a good faith, reasonable belief that
it did.  See Martin v. State Univ. of N.Y., 704 F. Supp. 2d 202,
228 (E.D.N.Y. 2010).

The language Plaintiff used in speaking with Tucker,
Trainor, and Fazzolari, supra, clearly identified her belief
that Michelson's behavior was differentiated on the basis of
gender, even if she did not make a formal complaint.  Plaintiff
testified that over her almost two years working with Michelson,
she became aware that fellow female employees Susan Davis, Vicki
Landes, Liya Davidov, and Nancy Kolodjeski each had experienced
what they felt was improper treatment by Michelson.  (See P.
56.1 ¶¶ 348-407.)  Plaintiff also avers that, with respect to
Michelson's treatment of male employees, she "saw him interact
in a variety of settings with Dave Thomas, John Olearczyk,
Adrian Gardner, Michael Martelacci, Alan Boardman, Rich
Weinberg, Robert Osgood, and Jiong Huang" and "never observed
Michelson raise his voice with a male employee in a manner
remotely like he did with her."  (P. 56.1 ¶¶ 410-11.)  A
reasonable jury could find, therefore, that it was not
objectively unreasonable for Plaintiff to have concluded at the
time she made her complaints that Michelson behaved differently
with women than he did with men.  Nor is the Court persuaded
that Defendant's several arguments in its papers, (see, e.g.,
Def. Mem. at 15), completely eliminate any possibility that

29

Plaintiff's subjective view was reasonable.  The fact that
Michelson never mentioned gender in pejorative terms and often
had positive interactions with Klotz, Trainor, and Tucker, (Def.
56.1 ¶¶ 183), while ultimately probative on the merits, does not
itself make Plaintiff's belief unreasonable.  Nor is Plaintiff's
conversation with Tucker about Landes not actionable merely
because Landes herself never lodged a formal complaint.  (See
Def. Mem. at 16.)  A jury could certainly believe that
Plaintiff, armed with the knowledge available to her at the time
of her complaints, proceeded under the belief that Michelson was
impermissibly differentiating his conduct at Fidelis on the
basis of gender.

    Finally, the Court notes that to the extent Plaintiff
engaged in protected activity under Title VII, Fidelis possessed
both constructive and actual knowledge of it.  Plaintiff's
language, supra, was more than sufficient to alert Human
Resources and the Chief Compliance Officer that Plaintiff was
making a complaint sounding in gender discrimination.  Because
Plaintiff complained to the individuals tasked with
investigating such complaints, (see Def. 56.1 ¶¶ 34-45),
Fidelis' knowledge may be imputed.  See Triola v. Snow, 289 Fed.
Appx. 414, 417 (2d Cir. 2008).  Particularly in light of her
choice of language in the September 13, 2006 meeting with
Trainor and Fazzolari, there can be no serious dispute that

"plaintiff's opposition was directed at conduct prohibited by Title VII" and by the NYCHRL.  See, e.g., Galdeiri-Ambrosis v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

           b.    Adverse Employment Action

    In order to be considered actionable in the retaliation context, an employer's action following Plaintiff's protected activity must be "materially adverse" enough to "dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  This standard is intended to "separate significant from trivial harms" because Title VII "does not set forth 'a general civility code for the American workplace.'"  Id. at 68 (quoting Oncale, 523 U.S. at 80).  Even the NYCHRL, which contains no material adversity requirement, nonetheless insists that any such employer action "reasonably deter a person from engaging in protected activity."  See Williams, 872 N.Y.S.2d at 34.  Here, Plaintiff points to her "marginalization" at work, her October 2006 performance review, and her January 3, 2007 termination.  The Court addresses each in turn.

    First, the Court must dispose of any attempt by Plaintiff to characterize her "marginalization" by Michelson in this case as an adverse employment action within the meaning of Title VII or the NYCHRL.  For the reasons described above, supra,

Plaintiff has simply failed to adduce evidence of sufficient weight and specificity to support a claim of retaliation on that basis.  Moreover, the Court is mindful that any such marginalization, at least under the evidence produced in this case to date, is likely characterized as a "trivial harm." Burlington, 548 U.S. at 68; see also Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) ("Plaintiff's allegation that he was excluded from management meetings, when considered in context, does not constitute an adverse employment action."); Short, 913 N.Y.S.2d at 66.

More compelling is Plaintiff's allegation that her October 2006 performance review and her January 3, 2007 termination were adverse employment actions within the meaning of Title VII and the NYCHRL.  It is certainly true that a poor review which results in no further adverse action cannot be deemed sufficient to dissuade a reasonable person from complaining of discriminatory treatment.  See Ragin v. East Ramapo Cent. Sch. Dist., No. 05 Civ. 6496, 2010 WL 1326779, at *17, aff'd, 417 Fed. Appx. 81 (2d Cir. 2011); Martinez-Santiago v. Zurich N. Am. Ins. Co., No. 07 Civ. 8676, 2010 WL 184450, at *11 ("A reasonable employee would not be dissuaded from filing a discrimination complaint merely because her supervisor gave her constructive employment-based criticism.").  Here, however, Plaintiff specifically alleges that her October 2006 performance

review was expressly the precursor for her January 2007
termination and differs markedly from her generally positive
March 2006 review.  (See P. 56.1 ¶¶ 188, 195; Opp. at 31.)
Under Plaintiff's theory of the case, both the October 2006
performance review and the January 2007 termination are
therefore related and "materially adverse" employment actions
within the meaning of Title VII and NYCHRL.  See Burlington, 548
U.S. at 57.  The arguments Defendant makes regarding whether the
termination in particular was in any way related to the
performance review, (see, e.g., Def. Reply Mem. at 12), are more
appropriately left for the discussion of pretext and causation.

c.   Causation and Pretext

Finally, in order to establish a prima facie case of
retaliation under Title VII, Plaintiff must demonstrate "a
causal connection exists between the protected activity and the
adverse action, i.e., that a retaliatory motive played a part in
the adverse employment action."  Kessler, 461 F.3d at 205-06
(citation omitted).  For convenience, the Court analyzes the
causation requirement on Plaintiff's prima facie case together
with her ultimate burden of persuasion in rebutting Fidelis'

33

non-discriminatory reasons for her negative review and
subsequent termination.[3]

A plaintiff alleging a causal connection between a
protected activity and an adverse employment action must
demonstrate evidence of "retaliatory animus by the decision-
makers who engaged in the adverse employment actions." Ragin,
2010 WL 1326779, at *24. Michelson took a personal leave of
absence beginning November 1, 2006, at which point Klotz became
the Acting Chief Medical Officer. (Def. 56.1 ¶¶ 204, 211.)
Fidelis submits that Klotz testified that after becoming Acting
Chief Medical Officer, she became concerned that Plaintiff had
"significant problems with systems, multitasking and managing
people in her department." (Def. 56.1 ¶ 288.) She also
testified that she found that Plaintiff "consistently blamed
others for problems while refusing to take responsibility for
her role in them or for failing to oversee processes and
individuals." (Def. 56.1 ¶ 289.) Based on her observations and
the input of Frawley, Klotz concluded that she needed to

---

[3] For the purposes of this motion, the Court assumes that Fidelis
has satisfied its burden of production in offering a legitimate,
nondiscriminatory reason for Plaintiff's negative review in
October 2006 and termination in January 2007. See McDonnell
Douglas, 411 U.S. at 800. The Court of Appeals has made clear
that Fidelis' burden of production is relatively light. See
Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998)
("The employer need not persuade the court that it was motivated
by the reason it provides; rather, it must simply articulate an
explanation that, if true, would connote lawful behavior.").

terminate Plaintiff immediately and was the sole decision maker
in doing so.  (Def. 56.1 ¶¶ 290-91, 298.)  For example, Klotz
testified that she viewed Frawley's memo as "informational only,
and not as a directive as to how to handle Plaintiff's
employment."  (Def. 56.1 ¶ 287.)  Critically, Klotz testified
that at "no time during [her] employment with Fidelis was she
aware that Plaintiff had made an internal complaint about Dr.
Michelson's behavior with regard to the BCAP project or at all
for that matter."  (Def. 56.1 ¶ 215.)

These facts might ordinarily be fatal to Plaintiff's claim
because in most cases where a decision maker cannot be shown to
have been aware of the protected activity, any adverse
employment action she undertakes is not causally related to that
protected activity.  See Ragin, 2010 WL 1326779, at *24.
Plaintiff, however, disputes material facts as set out by
Defendant in its 56.1 Statement.  In particular, Plaintiff
argues that Fidelis had resolved to terminate Casalino upon
Michelson's return from his leave of absence and then went about
the process of establishing a pretextual record to support that
action.  (See, e.g., P. 56.1 ¶ 285.)  In addition to pointing
out the extent to which Defendant shapes certain of Klotz's
testimony in its 56.1 Statement, Plaintiff specifically points
to several additional disputed facts:  (1) In response to
Frawley's e-mail, Trainor sent an e-mail to Klotz, copying

35

Michelson, Lane, Frawley, and Casalino that did not mention any concern over Plaintiff's "ability to act as a supervisor", (P. 56.1 ¶ 286); (2) by the time Klotz returned to work from a vacation on January 3, 2007, it was Lane who had already replaced Plaintiff as medical director at Center Care, (P. 56.1 ¶ 287); (3) Klotz actually testified that prior to arriving to work on January 3, 2007, she had "no plans" to terminate Casalino, that she in fact viewed the Frawley memo and Trainor e-mail as "the final straw" in her decision to terminate Plaintiff, and that she could not remember what else, if anything, she reviewed that day, (Pl. 56.1 ¶ 287-88); (4) Klotz spoke with Michelson in the office the day Plaintiff was terminated, (P. 56.1 ¶ 290); (5) Trainor testified that a meeting was convened on January 3, 2007 which included Trainor, Lane, Frawley, and perhaps even included Michelson, in which "a decision was reached at the meeting to terminate Casalino, and that Klotz would do it," (P. 56.1 ¶¶ 190-92); and (6) Michelson participated in Lane's decision to remove Plaintiff as medical director of Center Care when Lane asked Michelson to "review and comment" on his memo of January 2, 2007 announcing the Center Care change, to which Michelson replied, "Looks good.  Is the 'unspoken' message too obvious?" (P. 56.1 ¶ 293).  In light of these apparently disputed facts, the Court cannot agree with Defendant that Plaintiff "does not cite a <u>single</u> admissible fact

36

in support" of her theory that "the facts support an inference
that either Klotz was not the decision-maker or that she was
strongly influenced by Lane, Frawley, Trainor and Michelson, and
by the input of Michelson reflected in the October review."
(See Def. Reply Mem. at 13; Opp. at 33-34.)  Because the Court
has already determined that Fidelis was on constructive notice
of Plaintiff's protected activity, supra, Plaintiff's theory is
sufficiently compelling.  Moreover, the Court of Appeals has
elsewhere instructed that under the McDonnell Douglas framework,
"[t]o make out a prima facie case is not a demanding burden."
Greenway, 143 F.3d at 52.

There is no doubt that certain of Plaintiff's proffered
evidence is circumstantial, but circumstantial evidence on the
issue of causation and in rebutting Fidelis' non-discriminatory
motive for Plaintiff's termination is permissible.  See, e.g.,
Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 148 (2d Cir.
2010), cert. denied, 131 S. Ct. 1602 (2011) ("A causal
connection is sufficiently demonstrated if the agent who decides
to impose the adverse action but is ignorant of the plaintiff's
protected activity acts pursuant to encouragement by a superior
(who has knowledge) to disfavor the plaintiff."); Gordon v.
N.Y.C. Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000) ("A jury,
however, can find retaliation even if the agent denies direct
knowledge of a plaintiff's protected activities, for example, so

long as the jury finds that the circumstances evidence knowledge
of the protected activities or the jury concludes that an agent
is acting explicitly or implicit [sic] upon the orders of a
superior who has the requisite knowledge.") (emphasis added).
This is true whether in establishing a prima facie case or in
satisfying her ultimate burden of persuasion in the case.
Gordon, 232 F.3d at 117.  In fact, the Court of Appeals in
Gordon rejected the exact rule Defendant advocates here:  that
Klotz's lack of personal knowledge is itself fatal to
Plaintiff's claim.  See id.  Defendant is quick to characterize
Plaintiff's theory of retaliation as a "conspiracy," (see Def.
Reply Mem. at 14), apparently losing sight of the fact that a
successful fabrication of a pretext for discrimination is often
precisely that.

Moreover, Plaintiff is permitted to make her case for
causation at least in part on the temporal proximity between
engaging in the protected activities and suffering an adverse
employment action.  See Clark Cnty Sch. Dist. v. Breeden, 532
U.S. 268, 273 (2001); Hubbard, 347 Fed. Appx. at 681 (finding
that four months between protected activity and adverse
employment action did not exceed the "outer limit" of when
causation may be inferred from temporal proximity); Green Tree
Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (reversing
summary judgment where an adverse employment action occurred

38

within two months of plaintiff's complaint to management).
Here, Plaintiff seeks to demonstrate that over a two-year
engagement at Fidelis, her protected activity, negative review,
and termination all took place in what was effectively a four-
month period.  Moreover, her negative evaluation came less than
a month after her complaint regarding Michelson and differs not
insubstantially from her generally positive March 2006
performance review.  Finally, when the time Michelson spent out
of the office on personal leave is excluded, Plaintiff's January
3, 2007 termination follows a mere two months after her
September 2006 complaint and October 2006 negative performance
evaluation.  It is important to note too that Plaintiff is not
building her entire case-in-chief or rebuttal of pretext on
temporal proximity alone.

    Plaintiff may also demonstrate retaliatory intent and an
inference of causation with evidence of disparate treatment of
other employees engaging in the same or similar conduct for
which an adverse employment action is purported to have
occurred.  See, e.g., Raniola v. Bratton, 243 F.3d 610, 625 (2d
Cir. 2001); Gordon, 232 F.3d at 117.  Here, Plaintiff points as
an example to two of the incidents in December 2006 that Fidelis
claims demonstrated her inability to perform her position's
functions, arguing that her termination ultimately involved
mistakes by lower level employees far removed from Casalino

through intermediate supervisors.  (See, e.g., Opp. at 34.)
Plaintiff notes that no other Fidelis employee besides her was
disciplined.  (P. 56.1 ¶¶ 538, 564.)  In Hubbard, the Court of
Appeals recently rejected a defendant's argument on appeal that
Hubbard had not presented sufficient evidence to support a
jury's conclusion that the defendant's reasons for firing her
were pretextual.  See Hubbard, 347 Fed. Appx. At 681.  The
defendant had proposed that Hubbard had been terminated for
"excessive personal Internet use," and Hubbard had established
that other employees "used the Internet as much, or more, than
she did, and that only she and two other women were monitored."
Id.  The Court of Appeals concluded that this showing was
sufficient to reach the jury.  See id. ("The jury was entitled
to find that explanation to be pretextual.").  Here too, Fidelis
naturally offers an explanation for the disparity to which
Plaintiff points.  (See, e.g., Def. Reply 56.1 ¶ 564 (arguing
that the incidents reflected "a pattern of problems with
Plaintiff's job performance").)  As in Hubbard, however, that
explanation can be weighed by a reasonable jury.

Finally, the Court observes that Plaintiff may rely on
circumstantial evidence of pretext.  "[R]etaliatory intent may
also be shown in conjunction with the plaintiff's prima facie
case, by sufficient proof to rebut the employer's proffered
reason for the termination."  Parrish v. Sollecito, 258 F. Supp.

2d 264, 268 (S.D.N.Y. 2003) (citing <u>Reeves</u>, 530 U.S. at 143-49).
The Court of Appeals has noted that to survive summary judgment,
a Title VII plaintiff "has no obligation to prove that the
employer's innocent explanation is dishonest, in the sense of
intentionally furnishing a justification known to be false."
<u>Henry</u>, 616 F.3d at 156.   Instead, the plaintiff need only show
that the defendant "was in fact motivated at least <u>in part</u> by
the prohibited discriminatory animus."   <u>Id.</u> (citing <u>Gordon</u>, 232
F.3d at 117) (emphasis added).   It is well settled that a
plaintiff may do so "by demonstrating weaknesses,
implausibilities, inconsistencies, or contradictions in the
employer's proffered legitimate, nondiscriminatory reason for
its action."   <u>Ramos v. Marriott Intern, Inc.</u>, 134 F. Supp. 2d
328, 343 (S.D.N.Y. 2001) (citations and alterations omitted);
<u>see also</u> <u>EEOC v. Ethan Allen, Inc.</u>, 44 F.3d 116, 120 (2d Cir.
1994); <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 39 (2d Cir.
1994).

Beyond the disciplinary inconsistency discussed above,
<u>supra</u>, Plaintiff provides a list of no fewer than sixteen such
inconsistencies that she argues are supported by the record.
Among the most salient are:

- The evaluation given to Plaintiff by Michelson in October
2006 differed markedly from the evaluation also given by
Michelson in March 2006; Plaintiff's protected activity
occurred in September 2006 just before the second
evaluation.   <u>See, e.g.</u>, <u>Ibok v. Sec. Indus. Automation</u>

_Corp._, 369 Fed. Appx. 210, 213 (2d Cir. 2010) (pretext may be demonstrated where "evaluations of plaintiff post-dating the protected activity contradict earlier evaluations").

- All of the alleged grounds for termination, as detailed by Fidelis, occurred during a ten-day period at the end of December 2006.  (P. 56.1 ¶¶ 518-81.)

- Plaintiff was terminated immediately upon Michelson's return from his leave of absence.

- Klotz, Plaintiff's supervisor, had complimented Plaintiff's work in December 2006 prior to leaving for vacation, (P. 56.1 ¶¶ 500-07), and testified that she returned to Fidelis on January 3, 2007 with no intention of terminating Casalino, (P. 56.1 ¶¶ 590-91).

- Though Fidelis represents that Klotz herself made the decision to terminate Plaintiff for cause on January 3, 2007, Lane had already decided to appoint Klotz to replace Plaintiff as medical director of Center Care on January 2, 2007.  (P. 56.1 ¶ 605.)

- Though Fidelis represents that Klotz herself made the decision to terminate Plaintiff for cause on January 3, 2007, both Frawley and Trainor circulated critical memos and Trainor testified that a meeting was convened on January 3, 2007 which included Trainor, Lane, Frawley, and may have included Michelson, in which "a decision was reached at the meeting to terminate Casalino, and that Klotz would do it."  (P. 56.1 ¶¶ 190-92, 594-98.)

- Lane solicited Michelson's response to a draft of the January 2, 2007 announcement e-mail, indicating that they had already discussed Plaintiff's place in the department, to which Michelson replied, "Looks good.  But is the 'unspoken' message too obvious?"  (P. 56.1 ¶¶ 583-89.)

- Despite Fidelis' announcement on January 2, 2007 that Klotz would be talking over as medical director of Center Care, Klotz later testified that she never actually held that position, but served only until Plaintiff's replacement, Dr. Jonathan Kaplan, was selected.  (P. 56.1 ¶¶ 603-06.)

- Fidelis ignored its own "corrective action" policy set forth in detail in its Employee Handbook; Plaintiff was

terminated without any written warnings issued under the
policy.  (P. 56.1 ¶¶ 331-36, 600.)

(See Opp. at 35-37.)  Plaintiff's position is that taken
together, the record includes sufficient material, comprised of
permissible temporal proximity evidence, circumstantial evidence
of disparate treatment of employees, and circumstantial evidence
of pretext to establish that retaliation was, at least "in
part," a reason for her termination in January 2007.  See Henry,
616 F.3d at 156.  The same evidence goes to pretext.  See
Gordon, 232 F.3d at 117.  Given the Court of Appeals' recent
holding in Hubbard, 347 Fed. Appx. at 681, this Court is
constrained to find that true questions of fact exist as to
whether, among other issues, Klotz was the actual decision maker
in Plaintiff's termination, said termination was actually the
result, at least in part, of Plaintiff's protected activity
under Title VII, and whether Fidelis' stated legitimate
nondiscriminatory reasons are merely pretextual.

On a motion for summary judgment on a Title VII claim, the
Court of Appeals has made perfectly clear that Plaintiff need
not, as Fidelis appears to suggest, (see Def. Mem. at 24-25
(citing Weinstock, 224 F.3d at 42; James v. N.Y. Racing Ass'n,
233 F.3d 149, 156 (2d Cir. 2000)), actually demonstrate that
Fidelis' proffered reasons for her termination were themselves
purely false.  See Henry, 616 F.3d at 156.  Rather, the question

43

is whether, based on the evidentiary showing to date, Plaintiff may "invite the jury to ignore the defendant's proffered legitimate explanation and conclude that discrimination was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind."  See Field v. N.Y.S. Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 121 (2d Cir. 1997).  Resolving all ambiguities and drawing all reasonable inferences against Fidelis, as this Court must, Lindsay, 581 F.3d at 50, the Court cannot conclude "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).

                d.   NYCHRL Retaliation Claim

Retaliation claims under the NYCHRL are to be liberally construed, do not require an "ultimate action" with respect to employment or a "materially adverse change in the terms or conditions of employment," and are not restricted to the "standard currently applied by the Second Circuit in [Title VII] retaliation claims." Williams, 872 N.Y.S.2d at 33-34 (citations omitted).  Accordingly, because the Court has found Plaintiff's Title VII retaliation claim survives Fidelis' motion for summary judgment, so too does Plaintiff's NYCHRL retaliation claim.

3.   Gender-Based Discrimination:  Disparate Treatment

To state a prima facie case for gender-based disparate
treatment discrimination, Plaintiff must demonstrate:  (1)
membership in a protected class; (2) that she was qualified for
her position; (3) that she experienced an adverse employment
action; and (4) circumstances surrounding the adverse employment
decision that give rise to an inference of discrimination.  See
Gregory, 243 F.3d at 689.  As with the retaliation claim above,
Plaintiff's disparate treatment claim is analyzed using the
framework laid out in McDonnell Douglas.  If Plaintiff
establishes a prima facie case, Fidelis may proffer a
legitimate, non-discriminatory reason for the alleged adverse
employment action.  See Texas Dep't of Cmty. Affairs v. Burdine,
450 U.S. 248, 252-56 (1981).  If Fidelis meets this burden,
Plaintiff must then establish, by a preponderance of the
evidence, that Fidelis' stated reasons are merely pretext for
discrimination.  See id.

In order to establish her prima facie case of disparate
treatment discrimination, it is critical that Plaintiff
demonstrate that any adverse actions taken against her were done
under circumstances "giving rise to an inference of
discrimination" based on her gender.  See Leibowitz v. Cornell
Univ., 584 F.3d 487, 498 (2d Cir. 2009).  This element is
critical in analyzing the NYCHRL claim as well.  See Williams,

872 N.Y.S.2d at 41 ("[T]he primary issue for a trier of fact . .
. is whether the plaintiff has proven by a preponderance of the
evidence that she has been treated less well than other
employees <u>because of her gender</u>.") (emphasis added).  Such
inferences may be drawn from direct evidence, statistical
evidence, or circumstantial evidence.  <u>See</u> <u>generally</u> <u>Sogg v.</u>
<u>American Airlines</u>, 603 N.Y.S.2d 21 (1st Dep't 1993).  They must,
however, be more than inferences that Plaintiff's termination
was erroneous or unsupported by the facts alleged—they must be
inferences that gender discrimination itself was a reason for
the termination.  <u>See, e.g.</u>, <u>Babcock v. N.Y.S. Office of Mental</u>
<u>Health</u>, No. 04 Civ. 2261, 2009 WL 1598796, at *15 ("The fact
that [employer] may have relied on incorrect information is
immaterial to [Plaintiff's] gender discrimination claim.").  For
the reasons the Court has already identified in discussing her
gender harassment allegations under Title VII and NYCHRL, <u>supra</u>,
Plaintiff has simply failed to adduce sufficient factual
material to allow a reasonable jury to conclude that any adverse
action was taken against her specifically on the basis of her
gender, outside the specific context of retaliation for
protected activities.

This Court rejects Plaintiff's proposed reading of <u>Meiri v.</u>
<u>Dacon</u>, 759 F.2d 989 (2d Cir. 1985), <u>cert. denied</u>, 474 U.S. 829
(1985), which Plaintiff suggests permits her to "establish the

inference of discrimination (element four) by showing merely
that the employer sought a replacement for her position." (See
Opp. at 38.)  That is not the Court of Appeals' holding.
Instead, the Court of Appeals held that Plaintiff need not
establish that she was replaced by someone outside her own
protected class as a condition of surviving summary judgment.
See Meiri, 759 F.2d at 996 ("Assuming arguendo that Meiri did in
fact offer evidence sufficient to defeat summary judgment at the
prima facie stage, we must now address whether the INS satisfied
its burden of rebuttal.") (footnote omitted).  Similarly,
Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81 (2d Cir.
1996), merely clarified that Meiri does not support a rule
requiring Plaintiff to demonstrate on summary judgment that her
position remained open and that Fidelis continued to seek other
applicants.  See id. at 91.  In any event, neither holding
eliminates the requirement that Plaintiff adduce sufficient
evidence to permit a reasonable jury to conclude that she was
terminated because of her gender.

    Absent other direct, circumstantial, or statistical
evidence, Plaintiff has failed to produce sufficient evidence
that any adverse employment action Fidelis undertook had an
impermissible basis in gender as required by Title VII and the
NYCHRL to establish a prima facie disparate treatment claim.
See Leibowitz, 584 F.3d at 498; Williams, 872 N.Y.S.2d at 41.

Accordingly, Fidelis' motion for summary judgment on these claims is granted.

## CONCLUSION

For the reasons stated above, Defendant's Rule 56 motion for summary judgment [dkt. no. 37] is GRANTED in part with prejudice and DENIED in part.  The parties shall confer and inform the Court by letter no later than April 6, 2012 how they propose to proceed.


SO ORDERED.

Dated:     New York, New York
           March 30, 2012


                              _____
                              LORETTA A. PRESKA
                              Chief U.S. District Judge